**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LARRY JONES, | : | |
| | : | Civil Action No. 05-5088 (DMC) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ALFARO ORTIZ, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner pro <u>se</u>                        Counsel for Respondents
Larry Jones                             Linda K. Danielson
New Jersey State Prison                 Deputy Attorney General
P.O. Box 861                            Appellate Bureau
Trenton, NJ 08625                       P.O. Box 086
                                        Trenton, NJ 08625

**CAVANAUGH**, District Judge

    Petitioner Larry Jones, a prisoner currently confined at New
Jersey State Prison in Trenton, New Jersey, has submitted a
petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254.  The respondents are Administrator Alfaro Ortiz and the
Attorney General of New Jersey.

    For the reasons stated herein, all claims must be dismissed
with prejudice.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> ... At about 5:00 p.m. on March 21, 1985 Eugene Jones [Fn3] walked into the Ship & Shore warehouse in Paterson, New Jersey and approached the victim, one of the two partners who owned the wholesale seafood and produce distribution business located there.  Eugene Jones was recognized by an employee in the warehouse as a person from the neighborhood.

> > [Fn3] Eugene Jones was indicted as a codefendant. He is not related to Larry Jones.  Eugene was indicted with Larry Jones for the same offenses except for the purposeful and knowing murder charge.  ...  A different jury convicted Eugene Jones of all charges. ...

> Shortly thereafter an individual, later identified as Larry Jones, and recognized as a person from the neighborhood, walked towards the booth where the victim and Eugene Jones were talking.  As Larry Jones reached where the two men were talking, he grabbed the victim out of the booth and pulled a gun out of his pants. The victim's partner, who was also in the building at the time, went towards the men thinking there was going to be a fight.  He then heard a bang and the victim collapsed.

> At the trial an employee of the business testified that he observed the shooting and stated that Larry Jones had swung the victim around towards his approaching partner and the gun went off while the victim was in the line of fire.  Larry Jones then stuck

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

the gun in the other partner's neck and said "Boy, you better come back here or I'm going to blow this mother-f---er's head off" when the employee ran to hide behind a parked truck. The employee and the partner were ordered to lie on the ground. Both Joneses proceeded to take about $1,000 from the partner's wallet and about $2,000 to $3,000 from the pockets of the victim.

Another employee of the business and a customer who were in the facility at the time were also told to lie down on the floor. The employee was asked if he had any company money. As the Joneses searched for money, they rejected a plea to get help for the victim. Larry Jones stated, "I know what I'm doing. I know where I shot him. He's not going to die. He'll be fine." The Joneses ordered the four men (other than the victim who was shot) to a back area where they were locked in a walk-in freezer. After the perpetrators left, one of the men ran into the freezer door a number of times causing it to come off a hinge. Another man was then able to squeeze his way out and open the door for the others.

The police were called as the partner and an employee tried to revive the victim who had been dragged out of sight and was found lying near a truck. The victim was taken to St. Joseph's Hospital where he was pronounced dead on arrival as a result of a .22 caliber bullet perforating an artery.

At police headquarters one of the employees recognized the photograph of Rubin Jones, the brother of Larry Jones. Subsequently, Larry Jones' picture was identified from other photographs. At trial there was testimony identifying Larry Jones as somebody "from around town" and from the Paterson Boys Club. In addition, other testimony linked Larry Jones to the crime.

Larry and Eugene Jones were subsequently arrested in Chicago, Illinois on July 22, 1985 when Eugene Jones was observed acting suspiciously and peering into a liquor store after he left a brown Cadillac parked on the street. The police were investigating reports of a brown car which had been involved in an earlier robbery. As a police officer approached the Cadillac, he observed three men inside "making numerous movements, bending down and putting their arms

underneath the seats." At the same time Eugene Jones fled when another officer walked towards him.

The three men in the car were ordered out of the vehicle and a search was conducted. A gun was found under the driver's seat. The men were arrested and orally given their Miranda [Fn4] rights. A further search of the car revealed two more guns.

[Fn4] Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).

Shortly thereafter, Eugene Jones was apprehended on a street corner a few blocks away. He was arrested and after he was searched two more pistols were found on his possession. The suspects were taken to police headquarters where they were again advised of their Miranda rights. Eugene Jones gave a statement incriminating himself and Larry Jones in the robbery of a number of stores on the west side of Chicago.

On his arrest Larry Jones had given a false name of Tony Johnson. He continued to give that name in response to the questioning which followed his being advised of his Miranda rights. Although indicating that he understood these rights and refusing to answer any questions, Larry Jones denied involvement in the Chicago robberies.

A few hours later Eugene Jones was again questioned by a detective after being advised of his Miranda rights and again admitted committing numerous armed robberies in Chicago. He said that he had been a resident of Paterson, New Jersey and that he and Larry Jones were wanted there on a robbery charge. He indicated that they came to Chicago sometime in March 1985. Based on this information the Chicago police learned by checking their computer that both men were wanted for armed robbery and murder in Paterson, New Jersey.

As a result, Larry Jones was again interrogated on the morning of July 23rd. Upon being given his Miranda rights, Jones acknowledged that he understood them and stated that he was willing to talk. He denied being Larry Jones and denied having committed any crimes in Chicago or anyplace else. At 4:30 that afternoon defendant was placed in a series of lineups regarding

4

the Chicago armed robberies.  Due to the fact that some 33 armed robberies were involved, it took over six hours to conduct the lineups, interview the victims and then obtain approval from the state's attorney for the charges to be lodged.

After the investigatory procedures were completed in the early morning of July 24, 1985, Larry Jones was interviewed by a detective and a state's attorney.  The attorney advised Jones of his <u>Miranda</u> rights and Jones indicated that he understood them and was willing to make a statement.  Although he stated that he did not have any knowledge of the Chicago robberies, Jones admitted his involvement in the Paterson, New Jersey murder and robbery.  The detective testified as to what Jones said had happened:

> And at that time, he told me that he and Eugene had gone to a store which was around the corner from Larry's sister.  He said his sister had lived there for about twenty years and that they had entered the premises and that he had known the employees at that location for numerous years and that they knew him.  And that Eugene Jones had two guns with him and he had handed one of the guns to Larry and at this time, a white man by the name of Freddy grabbed ahold [sic] of the barrel of the gun and pulled on the gun and the gun went off and that he then dropped the weapon and fled the scene.

The state's attorney recounted Larry Jones' statement as follows:

> He then told me about the murder in New Jersey, said it was at the store that was around the corner from his sister's house where she had lived for something like twenty years.  He said that he knew the people in the store and they all knew him.  He said he went in the store with Eugene.  He said he didn't know that Eugene had planned to commit a robbery of the store.  He said that Eugene had two guns, he gave him one of the guns while they were in the store and he said that somebody named Freddy grabbed the barrel of his gun and that he pulled on it and it went off, shooting him in the stomach.  Then he said he dropped the gun, a .22, he left the store, ran

back to his sister's house, watched the police and ambulance arrive at the store.

He said he later saw Eugene and at that time, Eugene told him that he had gotten $2,000 from the robbery.  And then I believe that was most of the story.

However, Jones refused to give a written statement.

At the <u>Miranda</u> hearing which was held concerning the admissibility of the statements of both Larry Jones and codefendant Eugene Jones, defendant testified.  He admitted giving the police the false name of Tony Johnson when he was arrested, but said he did so because he had been previously convicted in 1976 of a robbery in New Jersey.  He denied having been given his <u>Miranda</u> rights or having confessed to the murder in Paterson at the Ship & Shore.  Defendant stated that the Chicago police officers refused to allow him to call his aunt after he was arrested so that she could have an attorney come to the police station.  He also asserted that he was hit with a flashlight by the officers following his arrest and when he asked to make a telephone call.

...

We next consider Jones' claim that his statement on July 24 should have been suppressed as violative of his Fifth and Sixth Amendment rights and his additional claim that he did not voluntarily waive his <u>Miranda</u> rights.  The judge made adequate and complete findings which included an express determination that defendant's testimony lacked credibility.  The record fully supports the judge's conclusions and we see no basis to overturn them.  <u>State v. Johnson</u>, <u>supra</u> (42 N.J. at 162).

... Nor do we find a violation of defendant's Fifth Amendment rights.  The evidence which the judge found credible was contrary to defendant's contention that he made a specific request for an attorney.  See <u>State v. Wright</u>, 97 N.J. 113, 120 (1984).

Moreover, the record amply supports the trial judge's conclusion that the length of time Jones was

detained was not only as a result of his lying about
his name to police upon his arrest, but also because he
and those arrested along with him were under suspicion
for approximately 33 armed robberies on the west side
of Chicago.  Thus, lineups involving an even greater
number of victims were required to be conducted prior
to the filing of formal charges.  Since the length of
time involved appears to have been reasonable in light
of these factors, it can be concluded that defendant
voluntarily waived his rights.  Cf. State v. Jones, 53
N.J. 568 (1969), cert. den, 395 U.S. 970, 89 S.Ct.
2122, 23 L.Ed.2d 759 (1969).

(Opinion of Superior Court of New Jersey, Appellate Division,

dated May 19, 1989, at 3-12.)

B.    Procedural History

Following a jury trial in the Superior Court of New Jersey,

Passaic County, Petitioner was convicted of murder, robbery,

kidnapping, and related charges.  On November 14, 1986,

Petitioner was sentenced to an aggregate term of life in prison,

with 30 years parole ineligibility.  On May 19, 1989, the

Superior Court of New Jersey, Appellate Division, affirmed the

conviction and sentence.  On October 31, 1989, the Supreme Court

of New Jersey denied certification.  See State v. Jones, 118 N.J.

210 (1989).  The Supreme Court of New Jersey denied

reconsideration on December 7, 1989.  Petitioner did not petition

the U.S. Supreme Court for a writ of certiorari.  Thus, for

federal habeas purposes, the conviction became final ninety days

later, on March 7, 1990.  See 28 U.S.C. § 2244(d)(1)(A).

Thereafter, Petitioner embarked on a series of collateral

challenges to the conviction in state court.  Petitioner filed

his first state-court petition for post-conviction relief (PCR) on or about March 12, 1990. The trial court denied relief on April 18, 1990. The Appellate Division affirmed the denial of relief on March 26, 1992. The Supreme Court of New Jersey denied certification on June 25, 1992. <u>State v. Jones</u>, 130 N.J. 16 (1992).

Petitioner filed his second state PCR petition on or about January 7, 1994. The trial court denied relief on June 20, 1994. The Appellate Division affirmed the denial of relief on May 19, 1997, holding that the petition was clearly barred by New Jersey Court Rules 3:22-5[2] and 3:22-12.[3] (Respondents' Response to OTSC [14], "OTSC Response", Ex. R3.) The Supreme Court of New Jersey denied certification on June 30, 1998.

---

[2] Rule 3:22-5, "Bar of Ground Expressly Adjudicated," provides:

> A prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such proceedings.

[3] Rule 3:22-12, "Limitations," provides, in pertinent part:

> (a) General Time Limitations. A petition to correct an illegal sentence may be filed at any time. No other petition shall be filed pursuant to this rule more than 5 years after rendition of the judgment or sentence sought to be attacked unless it alleges facts showing that the delay beyond said time was due to defendant's excusable neglect.

Petitioner filed his third state PCR petition on June 7, 1999.  The trial court denied relief on June 17, 1999.  On October 29, 2001, the Appellate Division affirmed the denial of relief, finding the petition barred by Rules 3:22-4,[4] 3:22-5, and 3:22-12.  (OTSC Response, Ex. R9.)  On March 8, 2002, the Supreme Court of New Jersey denied certification.  See State v. Jones, 171 N.J. 443 (2002).

Petitioner filed his fourth state PCR petition on April 11, 2002.  The trial court denied relief on October 2, 2002, and denied reconsideration on December 13, 2002.  The Appellate Division affirmed the denial of relief on May 2, 2003, finding the petition barred by Rules 3:22-4 and 3:22-12.  (OTSC Response, Ex. R13.)  Petitioner apparently did not petition for certification.

---

[4] Rule 3:22-4, "Bar of Grounds Not Raised in Prior Proceedings; Exceptions," provides:

Any ground for relief not raised in a prior proceeding under this rule, or in the proceedings resulting in the conviction, or in a post-conviction proceeding brought and decided prior to the adoption of this rule, or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds (a) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.

9

Petitioner states that in May, 2003, he first learned of a report by the Governor of Illinois that certain police officers in southside Chicago had tortured suspects in the mid-1980s to obtain confessions and that, if they could not so obtain a confession, they testified falsely that they had obtained confessions, and that the Governor had pardoned, released, or granted appeal rights to many Illinois prisoners because of this malfeasance.  (Amended Motion for Reconsideration at 6-7.)

Shortly thereafter, Petitioner filed his fifth state PCR petition.  On May 28, 2003, the trial court denied relief.  On November 19, 2004, the Appellate Division affirmed the denial of relief, finding the petition barred by Rule 3:22-12.  (OTSC Response, Ex. R17.)  On March 1, 2005, the Supreme Court of New Jersey denied certification.  See State v. Jones, 183 N.J. 213 (2005).

This Petition, dated October 15, 2005, followed.  Based upon the allegations of the Petition, this Court initially dismissed the Petition as untimely.  In response to a Motion for Reconsideration, this Court vacated its prior order, re-opened this matter, and ordered the parties to show cause, on a case-by-case basis, why the Petition should not be dismissed as untimely. This matter is now ready for a determination of the timeliness issue.

II.  <u>ANALYSIS</u>

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

>    (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d), which provides in pertinent part:

>    (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>
>    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; ...
>
>    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
>    (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

The limitations period is applied on a claim-by-claim basis.  <u>See</u> <u>Fielder v. Verner</u>, 379 F.3d 113 (3d Cir. 2004), <u>cert. denied</u>, 543 U.S. 1067 (2005); <u>Sweger v. Chesney</u>, 294 F.3d 506 (3d Cir. 2002).

For most claims, evaluation of the timeliness of a § 2254 petition requires a determination of, first, when the pertinent

11

judgment became "final," and, second, the period of time during which an application for state post-conviction relief was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court.  See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.

Where a conviction became final prior to April 24, 1996, the effective date of § 2244(d), a state prisoner has a one-year grace period after that effective date to file a § 2254 petition, barring statutory or equitable tolling.  Burns v. Morton, 134 F.3d 109, 111 (3d Cir. 1998).

To statutorily toll the limitations period, a state petition for post-conviction relief must be "properly filed."

> An application is "filed," as that term is
> commonly understood, when it is delivered to, and
> accepted by the appropriate court officer for placement
> into the official record.  And an application is
> "properly filed" when its delivery and acceptance are
> in compliance with the applicable laws and rules
> governing filings.  These usually prescribe, for
> example, the form of the document, the time limits upon
> its delivery, the court and office in which it must be
> lodged, and the requisite filing fee.  In some
> jurisdictions the filing requirements also include, for
> example, preconditions imposed on particular abusive
> filers, or on all filers generally.  But in common
> usage, the question whether an application has been

12

"properly filed" is quite separate from the question
whether the claims contained in the application are
meritorious and free of procedural bar.

Artuz v. Bennett, 531 U.S. 4, 8-9 (2000) (citations and footnote
omitted) (finding that a petition was not "[im]properly filed"
merely because it presented claims that were procedurally barred
under New York law on the grounds that they were previously
determined on the merits upon an appeal from the judgment of
conviction or that they could have been raised on direct appeal
but were not).

Where a state court has rejected a petition for post-
conviction relief as untimely, however, it was not "properly
filed" and the petitioner is not entitled to statutory tolling
under § 2244(d)(2). Pace v. Diguglielmo, 544 U.S. 408 (2005).
This is so even where, in the alternative, the state court
addresses the merits of the petition in addition to finding it
untimely. Carey v. Saffold, 536 U.S. 214, 225-26 (2002).

An application for state post-conviction relief is
considered "pending" within the meaning of § 2244(d)(2), and the
limitations period is statutorily tolled from the time it is
"properly filed," during the period between a lower state court's
decision and the filing of a notice of appeal to a higher court,
Carey v. Saffold, 536 U.S. 214 (2002), and through the time in
which an appeal could be filed, even if the appeal is never
filed, Swartz v. Meyers, 204 F.3d at 420-24. However, the time

13

during which a state prisoner may file a petition for writ of
certiorari in the United States Supreme Court from the denial of
his state post-conviction petition, or the time during which a
state prisoner's petition for certiorari is pending in the U.S.
Supreme Court, does not toll the one year statute of limitations
under 28 U.S.C. § 2244(d)(2).  See Lawrence v. Florida, 2007 WL
505972 (U.S. Feb. 20, 2007); Stokes v. District Attorney of the
County of Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert.
denied, 534 U.S. 959 (2001).

     The limitations period of § 2244(d) also is subject to
equitable tolling.  Fahy v. Horn, 240 F.3d 239, 244 (3d Cir.),
cert. denied, 534 U.S. 944 (2001); Jones v. Morton, 195 F.3d 153,
159 (3d Cir. 1999); Miller v. New Jersey State Dept. of
Corrections, 145 F.3d 616, 618 (3d Cir. 1998).  Equitable tolling
applies

> only when the principles of equity would make the rigid
> application of a limitation period unfair.  Generally,
> this will occur when the petitioner has in some
> extraordinary way been prevented from asserting his or
> her rights.  The petitioner must show that he or she
> exercised reasonable diligence in investigating and
> bringing the claims.  Mere excusable neglect is not
> sufficient.

Miller, 145 F.3d at 618-19 (citations and punctuation marks
omitted).  Among other circumstances, the Court of Appeals for
the Third Circuit has held that equitable tolling may be
appropriate "if the plaintiff has timely asserted his rights
mistakenly in the wrong forum," i.e., if a petitioner has filed a

14

timely but unexhausted federal habeas petition.  <u>Jones</u>, 195 F.3d

at 159.  <u>See also</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 183 (2001)

(Stevens, J., joined by Souter, J., concurring in part) ("neither

the Court's narrow holding [that the limitations period is not

statutorily tolled during the pendency of a premature federal

habeas petition], nor anything in the text or legislative history

of AEDPA, precludes a federal court from deeming the limitations

period tolled for such a petition as a matter of equity"); 533

U.S. at 192 (Breyer, J., dissenting, joined by Ginsburg, J.)

(characterizing Justice Stevens's suggestion as "sound").

Finally, "a pro se prisoner's habeas petition is deemed

filed at the moment he delivers it to prison officials for

mailing to the district court."  <u>Burns v. Morton</u>, 134 F.3d 109,

113 (3d Cir. 1998) (citing <u>Houston v. Lack</u>, 487 U.S. 266 (1988)).

Here, Petitioner asserts ten claims: (1) the state courts

erred in denying Petitioner's first and second PCR petitions as

untimely,[5] (2) the Chicago police improperly interrogated

---

[5] Errors in state post-conviction relief proceedings are
collateral to the conviction and sentence and do not give rise to
a claim for federal habeas relief.  <u>See</u>, <u>e.g.</u>, <u>Hassine v.
Zimmerman</u>, 160 F.3d 941, 954 (3d Cir.1998), <u>cert. denied</u>, 526
U.S. 1065 (1999) ("The federal role in reviewing an application
for habeas corpus is limited to evaluating what occurred in the
state or federal proceedings that actually led to the
petitioner's conviction; what occurred in the petitioner's
<u>collateral</u> proceeding does not enter into the habeas
calculation.... Federal habeas power is 'limited ... to a
determination of whether there has been an improper detention by
virtue of the state court judgment."); <u>Ferguson v. State</u>, 1996 WL
1056727 (D.Del. 1996) and cases cited therein.  Accordingly, this

Petitioner, after indictment, without counsel and under improper conditions including no Miranda warnings, being handcuffed, and being denied food and water, phone calls, and bathroom privileges, (3) Chicago and New Jersey law enforcement officers withheld Chicago police reports stating the Petitioner did not confess to the New Jersey murder, which Petitioner obtained in 1999, (4) the Chicago police falsely testified that Petitioner had confessed to them or, alternatively, they beat a confession out of him, as evidenced by the fact that the Governor of Illinois found that these same officers had "poisoned" capital murder cases in Illinois by torturing suspects to obtain confessions, (5) the state procured the perjured testimony of several witnesses, (6) the pre-trial identification procedures were unduly prejudicial, (7) ineffective assistance of trial counsel, withholding of evidence, and due process violations at trial as evidenced by the fact that a juror removed by a defense peremptory challenge remained on the jury, (8) sentencing error in the weighing of aggravating and mitigating factors by the judge, (9) a manifestly excessive sentence, and (10) Chicago police improperly made him stand in lineups related to 33 Chicago robberies without counsel.

---

claim must be dismissed.

Here, Ground (1) must be dismissed as it fails to state a ground for federal habeas relief. Only grounds related to the manner in which Petitioner was interrogated in Chicago, (2), (3), (4), and (10),[6] allegedly rely upon evidence obtained after the conviction became final. Accordingly, for all other claims, timeliness is determined pursuant to § 2244(d)(1)(A), from the date on which the judgment of conviction became final. Thus, here, where Petitioner's conviction became final prior to the effective date of § 2244, Petitioner had until April 24, 1997, to file his § 2254 petition, unless the time for filing was statutorily or equitably tolled.

On April 24, 1997, Petitioner's second state PCR petition was pending. Ultimately, the state courts found that the petition was untimely. Accordingly, it was not "properly filed" and did not statutorily toll the limitations period. Nor did the third, fourth, or fifth state PCR petitions toll the limitations period, as they also were deemed untimely. Thus, all claims not dependent upon allegedly recently-discovered evidence must be dismissed with prejudice as untimely.

Ground (3), that law enforcement officials improperly withheld exculpatory evidence, is based upon Petitioner's acquisition in 1999, through review of co-defendant Eugene

---

[6] The Court construes Ground 10 as an allegation that the line-ups were so lengthy that they were improper and somehow contributed to the subsequent confession.

17

Jones's legal papers, of a Chicago police report purportedly demonstrating that Petitioner never made a confession regarding the New Jersey robbery and murder to the Chicago police officer and prosecutor who testified at Petitioner's trial.  (Brief on Behalf of Petition at 58, Exs. 3, 4, 6, 9.)  Petitioner asserts that his counsel requested all of the co-defendant's records before trial, but that these police reports were not included in the documents produced.  This is a "Brady" claim.[7]

Petitioner states that he obtained this evidence in 1999.  Assuming that the claim otherwise meets the requirements of § 2244(d)(1)(D), and barring some basis for statutory or equitable tolling, Petitioner should have filed his federal petition on this claim in 2000, no more than one year after he obtained the evidence.  The state courts of New Jersey denied Petitioner's 1999, 2002, and 2003 petitions as untimely.  Thus, they were not "properly filed" and did not statutorily toll the

---

[7] The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant. See Brady v. Maryland, 373 U.S. 83 (1967), Giglio v. United States, 405 U.S. 150, 154 (1972) ("A finding of materiality of the evidence is required under Brady."). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). Nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" Kyles v. Whitly, 514 U.S. 419, 434 91995) (quoting Bagley, 473 U.S. at 678).

limitations period for this federal Petition.  Petitioner has asserted no facts that would suggest a basis for equitable tolling.  Thus, this claim is untimely.

In any event, the claim is meritless.  Exhibit 3 attached to Petitioner's brief is the report of interrogation of co-defendant Eugene Jones, in which Eugene Jones implicates Petitioner in the New Jersey crimes, but nowhere indicates whether Petitioner did or did not confess to the New Jersey robbery and murder.  Exhibit 4 includes notes regarding the interrogation of Petitioner and states that, before the line-ups, he denied having committed the New Jersey robbery and murder.  Exhibit 4 does not include notes of any interrogation of Petitioner after the line-ups.  This notation conforms to the evidence at trial that Petitioner initially denied participation in the New Jersey crimes but, after the line-ups for the Chicago robberies, later confessed. Exhibit 6 includes only early notes of a New Jersey investigator that Petitioner and his co-defendant had been apprehended in Chicago and that the investigation was continuing.  Exhibit 9 includes notes of the interrogation of co-defendant Eugene Jones, in which Eugene Jones gave Petitioner's true name and indicated that they were both wanted in New Jersey for robbery and related crimes, so does not relate to the interrogation of Petitioner or otherwise support his claim.  The evidence supplied by Petitioner

does not indicate any <u>Brady</u> violation.  Accordingly, Petitioner is not entitled to relief on this claim.

Finally, claims (2), (4), and (10) are the only claims that arguably rely upon Plaintiff's learning in May 2003 that the Governor of Illinois had announced the results of an investigation determining that, in the 1980s and 1990s, certain Chicago police officers had beaten suspects to obtain confessions or had testified falsely about confessions.  The factual predicates for these claims, however, were available to Petitioner at the time of trial.  They challenge either the pre-trial interrogation techniques experienced by Petitioner or trial testimony of Chicago police and prosecutors.  Indeed, these claims were raised in the pre-trial motion to suppress, on direct appeal, and in state-court collateral challenges to the conviction.[8]  The investigation by the Governor of Illinois constitutes merely additional evidence in support of these claims.

> Section 2244(d)(1)(D) does not restart the time when corroborating evidence becomes available; if it did, then the statute of limitations would fail in its

---

[8] Petitioner moved to suppress his statements to Chicago authorities before trial, on the grounds that (1) he had made no such statements and (2) the statements were coerced in violation of his federal constitutional rights because he was not advised of his right to counsel and because of the conditions under which the interrogations took place.  (OTSC Response, Exs. R19, R20.) Petitioner raised the same claims on direct appeal and in his first, second, and third petitions for post-conviction relief. (OTSC Response, Ex. R1 at 34-41, Da28, Da55; Ex. R3; Ex. R7.)

purpose to bring finality to criminal judgments, for
any prisoner could reopen the judgment by locating any
additional fact.  As a matter of law, new evidence
supporting a claim actually made at or before trial
cannot form the basis of a new period under
§ 2244(d)(1)(D).

Escamilla v. Jungwirth, 426 F.3d 868, 871 (7th Cir. 2005).  See

also Winters v. Lamarque, 171 Fed.Appx. 186, 187 (9th Cir.),

cert. denied, 127 S.Ct. 593 (2006).  Thus, the one-year

limitations period did not begin to run in May 2003, but began to

run, instead, when Petitioner's conviction became final.  These

claims are untimely.

Even if the limitations period did begin to run on these

claims in May 2003, Petitioner would have had to file this

federal Petition by May 2004, unless the limitations period was

statutorily or equitably tolled.  As has already been noted,

Petitioner's 2003 state-court PCR petition was rejected as

untimely; accordingly, it did not statutorily toll the

limitations period.  Nor has Petitioner suggested any basis for

equitable tolling.  Under either § 2244(d)(1)(A) or (D), the

claims related to the interrogation and testimony of Chicago

police and prosecutors are untimely.

### III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or

judge issues a certificate of appealability, an appeal may not be

taken from a final order in a proceeding under 28 U.S.C. § 2254.

A certificate of appealability may issue "only if the applicant

21

has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, jurists of reason would not find this Court's procedural ruling debatable.  No certificate of appealability shall issue.

IV.  CONCLUSION

For the reasons set forth above, the Petition must be dismissed with prejudice as untimely.  An appropriate order follows.

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh
United States District Judge

Dated: February 28, 2007